## BUSHNELL STEEL CO. v. UNITED STATES.
### No. 47534.

**United States Court of Claims**
**July 10, 1950.**

Robert H. Givens, Jr., Miami, Fla. for plaintiff.

Frank J. Keating, Washington, D. C. and Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff sues for extra costs incurred by reason of delays on the part of the Navy Department of the United States in furnishing it with certain information which it had to have before it could ship ten barges ordered by the Navy.

In August 1944 plaintiff had entered into a contract with the United States Army Transportation Corps to construct for it 11 crane barges. After the cessation of hostilities in Europe this contract was terminated, to wit, on June 13, 1945, whereupon plaintiff closed its plant, discharged its personnel, and cancelled all of its subcontracts

in connection with the construction of the barges. When the contract was terminated one barge had been shipped, leaving 10 to be delivered under the Army contract. Apparently, this was the only work upon which plaintiff was engaged at the time.

A little less than a week later, the United States Navy Department notified plaintiff that the Navy wanted the remaining 10 barges which the Army had previously ordered, and on the following day it sent plaintiff a telegram reading in part:

"Enter our order * * * for ten kd steel barges which are being terminated on army transportation corp contract W33-092 TC-2818 for shipment to advance base depot Gulfport Mississippi prices and terms to be negotiated naval inspection will be required wire acknowledgement confirmations to follow"

On the same day plaintiff wrote the Navy Department proposing to furnish the ten uncompleted barges previously ordered by the Army for $54,530.00 each.

Plaintiff's executive vice president then went to Chicago to confer with the Navy Department relative to prices and terms for the remaining 10 barges. It was there agreed that no change would be made in the design of them, but that there would be certain changes in marking and shipping instructions, which were to be forwarded to plaintiff immediately by air mail. It was agreed that one barge would be shipped within a week from receipt of defendant's order, two within the following 30 days, and three every 30 days thereafter until the contract had been fully performed. It was also agreed that in order to avoid delay in resuming production for the Navy that $4,-000 per barge would be added to the price at which plaintiff had agreed to furnish the barges to the Army, in order to cover all expenses and damages suffered by plaintiff as a result of the termination of the Army contract. A formal purchase order was to be prepared and furnished the plaintiff.

This agreement was confirmed by letters exchanged between the parties, wherein the plaintiff agreed to furnish the 10 remaining barges at $54,530.00 each, and to relieve the Government from any liability on account of the termination of the Army contract.

The Navy had immediate need for the barges and urged plaintiff to expedite delivery as much as possible, even in advance of the agreed delivery dates if it was possible to do so.

When the Army terminated its contract with plaintiff, plaintiff had completed the second barge and was ready to ship it. It could have shipped this barge under its contract with the Navy almost immediately upon receiving the Navy's order, except for the fact that it had to await marking and shipping instructions from the Navy. While awaiting these instructions plaintiff proceeded with fabrication of the parts for the remaining barges. It resumed fabrication of these remaining parts on Monday, June 25, on which day there was expended 853 man-hours of labor, 528 man-hours of which were direct labor on the barges. From this time on, until July 12, it spent approximately 900 man-hours per day. During all this time it was awaiting marking and shipping instructions from the Navy. On June 28, 1945, six days after the conclusion of plaintiff's conference with the Navy in Chicago, the Navy wired plaintiff that the painting specifications for the barges as set out in the Army contract were to be used and that marking instructions "should be available tomorrow; will advise further."

Since, when plaintiff entered into the contract with the Navy it already had on hand one barge ready for shipment, and since under the urgings of the Navy it was expending every possible effort to complete the remaining barges, and since it had not received marking and shipping instructions for any of the barges, its plant became congested with the parts already fabricated and being fabricated; hence, on July 2 it sent the Navy Department a telegram reading in part:

"Completed crane barge has our facilities blocked impeding production. Urgent we receive immediate marking information enabling us to make shipment. Please wire when can expect."

Three days later the Navy Department in Chicago wrote plaintiff transmitting packing specifications and marking instructions, but there was not enclosed therein a certain "shipping symbol", which the instructions called for. Plaintiff did not receive this until July 11, 1945. Until this was received none of the parts could be shipped.[1]

Defendant does not dispute plaintiff's assertion that its plant was seriously congested during this period, nor that this congestion substantially increased plaintiff's cost of production.

It seems that plaintiff had a ten-ton crane which ran alongside its plant and which was used for the transportation of materials, first from the point where they were received from the railroad siding on the east side of plaintiff's plant, and then to the various jigs where work was done upon them, and then to the west of plaintiff's plant where they were painted and packed, and from which they were then moved by the crane back to the railroad siding for loading. When the Army contract was terminated quite a lot of the parts for the barges were stored in the west portion of the crane runway and in intermediate places along this runway between the west end and the east end, and, as production continued, additional parts had to be stored in this area while awaiting shipping instructions for the parts already fabricated. This resulted in the storage of parts out of order and required handling and rehandling of the parts, which would not have been necessary except for the congestion. All of this apparently considerably increased plaintiff's costs.

Had defendant promptly given plaintiff marking and shipping instructions, much of this congestion would not have developed. Nor was plaintiff at fault for continuing to fabricate other parts, which of course increased the congestion, since the defendant had urged plaintiff to speed production as much as possible, and since at the conference in Chicago on June 20-22 it had promised to send marking and shipping instructions immediately by air mail, and on June 28 it had advised plaintiff that marking in-

structions should be available the following day. Plaintiff had a right to expect that the necessary instructions for shipment of the parts for the barges would be in hand at any moment, and, hence, it would seem that it was justified in continuing production, even though this aggravated the congestion.

The defendant does not defend on the ground that plaintiff was at fault in continuing production, but it says that even though plaintiff had received marking and shipping instructions promptly, it nevertheless would have been delayed in shipping the parts for the barges, because of the fact that the Navy inspectors found defects in the welding and required plaintiff to chip off the welding formerly placed on the panels for the barges, and that this was responsible, in part at least, for the delay. The parts that had been fabricated under the Army contract had been inspected and approved by the Army inspectors, but when the Navy inspectors arrived on July 2 they rejected the welding on some of the panels as unsatisfactory and they required that these defects be remedied. This of course necessitated the rehandling of these parts and the reworking of them, and this did consume some time, but the amount of time consumed thereby cannot be ascertained from the testimony. Apparently it was some two or three days. But, even taking this into account, the Navy nevertheless delayed plaintiff a week or so beyond the time that it had the parts fabricated to the satisfaction of the Navy inspectors.

■ We are of the opinion that the Navy's delay in forwarding plaintiff marking and shipping instructions did delay it and was responsible for the resulting congestion in plaintiff's plant, which largely increased the cost of production. For this increase in cost, whatever it may have been, the defendant is responsible, since plaintiff was entitled to expect shipping instructions momentarily, which would have prevented the congestion, and since it had urged plaintiff to rush production as much as possible.

The difficulty in the case is to determine how much plaintiff was damaged by defend-

---

1. It should be said that the barges were not assembled at plaintiff's plant. Parts therefor were shipped to be assembled at the place designated by the Navy.

ant's delay in furnishing these instructions. Plaintiff undertakes to compute its damage by proving its estimate of costs and deducting this amount from its actual costs. This, however, is an improper basis for determining its damage, because there is no showing that plaintiff's estimates were correct.

The Commissioner of this court, rejecting the basis upon which plaintiff computed its damage, has undertaken to compute it by a comparison of plaintiff's costs under the Army contract and the comparison of its costs during the period of congestion. This seems to us the best method.

Prior to termination of the Army contract plaintiff had completed 32.6 percent of all the fabrication which had to be done for the 11 barges. Its labor costs prior to termination of the Army contract were $52,182.98. Since these costs were incurred in the completion of 32.6 percent of the entire contract for the 11 barges, its labor costs were $1,599.00 for each one percent of performance of the entire contract. During the period from the time plaintiff resumed fabrication of the barges for the Navy until July 13, 1945, when the first barge for the Navy was shipped, its labor costs were $24,827.87. During this time plaintiff performed only 8.96 percent of the total contract for the 11 barges, resulting in a labor cost of $2,771.00 for one percent of performance. However, it is to be remembered that during this period certain corrections had to be made in the welding on the panels for these barges. To what extent this increased labor costs per one percent of performance is not shown by the record. However, from July 14 to August 31, 1945, on which latter date the congestion had been relieved, plaintiff's labor costs were $53,832.57. During this time plaintiff performed 20.71 percent of the total fabrication for the 11 barges. This represented a labor cost of $2,599.00 for each one percent of performance. During this time no labor was expended in repairing defects and this period probably gives the most accurate comparison of the labor costs during the period of the congestion and prior thereto. During this period plaintiff's labor costs were $1,000.00 for each one percent of performance

more than its costs had been prior to the congestion.

It is not easy to understand how it should have taken until August 31, 1945, to relieve the congestion caused by defendant's approximate three week's delay in forwarding the marking and shipping instructions. However, one partial explanation for this long period of time is to be found in the fact that on August 15, 1945, the Navy Department terminated the Navy contract and directed cessation of all work and further shipments. Although on the following morning the Navy Department wired plaintiff that this order of termination had been sent in error and directed resumption in production and shipment, nevertheless, the Navy inspector at plaintiff's plant required plaintiff to unload all cars already loaded and to refrain from loading other cars until he had received official advice that the contract was not to be terminated. Plaintiff did unload the cars and was delayed for about a week before the Navy inspector received official advice that the contract had not been terminated, and additional cars could be secured.

Although we have some hesitancy in concluding that it should have taken as long as August 31, 1945, to have cleared up the congestion, nevertheless, defendant does not seriously dispute this. It says instead that the length of time it took to do so was caused, in part at least, by the periodic breakdown of the ten-ton crane used for moving materials from one point to another. It is true that during this period this crane did break down on several different occasions and some time was consumed in putting it back into operation. However, there is no showing that this crane did not break down equally as much during the period of the Army contract and, therefore, the fact that it broke down during performance under the Navy contract does not show that it is improper in assessing plaintiff's damages to compare its costs during the performance of the Army contract and its costs in the performance of the Navy contract up until the time the congestion was relieved on August 31, 1945.

580

From the time the Navy ordered the 10 barges remaining uncompleted under the Army contract until August 31, 1945, plaintiff's labor costs exceeded its labor costs under the Army contract by $1,000 per one percent of performance. During this period there was performed 29.67 percent of the entire contract for the 11 barges. This indicates that plaintiff's excess labor costs during the period of congestion were $29,670.00.

 The findings also show that plaintiff's overhead expense allocable to the contract work was increased during this period. The overhead represents 25.5 percent of labor and materials. There is, therefore, to be added to the $29,670.00 for excess labor costs 25.5 percent thereof, representing increased overhead. This amounts to $7,565.85. This added to $29,670.00 amounts to a total of $37,235.85.

Upon the basis of the evidence presented, we are of the opinion that plaintiff is entitled to recover of the defendant total excess costs, including overhead, in the sum of $37,235.85. Judgment for this amount will be entered.

JONES, Chief Judge, and HOWELL, MADDEN, and LITTLETON, JJ., concur.